**WO**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jesse Brooks, | No. CV-21-00265-TUC-JCH |
| Plaintiff, | **ORDER** |
| v. | |
| Centurion of Arizona LLC, | |
| Defendant. | |

Plaintiff Jesse Brooks ("Plaintiff"), who is confined in the Arizona State Prison Complex (ASPC)–Tucson, has filed through counsel this civil rights action under 42 U.S.C. § 1983 seeking declaratory and injunctive relief. (Doc. 1.) Before the Court is (1) Plaintiff's second Motion for Preliminary Injunction ("Motion I") (Doc. 26.) Also before the Court are related motions, including: (2) Plaintiff's Motion to Supplement the Record and/or Amend the Joint Pre-Trial Report ("Motion II") (Doc. 107); and (3) Defendant Centurion of Arizona LLC's ("Centurion") unopposed Motion for Extension of Time to Respond to Motion II ("Motion III") (Doc. 108).  The Court **DENIES** Motion I and Motion II and **GRANTS** Motion III.

**BACKGROUND**

On July 7, 2021, Plaintiff filed his first motion for preliminary injunction, (Doc. 3), and requested that he be provided certain pain medications "while he is in trial in *Brooks I*." (Doc. 3 at 16); *see also* Doc. 1 at 19 (seeking "[p]reliminary injunctive relief in the form of an Order that Defendants maintain Plaintiff on the prescribed, effective medication protocol that provides 24-hour pain relief . . . through the end of trial and any appeals in *Brooks I*.").[1] On August 10, 2021, the parties in *Brooks I* filed a notice of settlement. (*See* Doc. 127 in *Brooks I*). Because the parties settled *Brooks I*, this Court denied as moot Plaintiff's first motion for preliminary injunction. (Doc. 21 at 2.)

On December 3, 2021, Plaintiff filed his second motion for preliminary injunction. (Doc. 26.) In support of Motion I, Plaintiff offered an expert witness opinion from F. Michael Ferrante, M.D. ("Dr. Ferrante"). (*See* Doc. 26-1.) Dr. Ferrante opined, based on the severity and chronicity of Plaintiff's pain, that Plaintiff required, and was not currently receiving, an opioid treatment administered to provide continuous 24-hour analgesic. (Doc. 26-1 at 4.) Specifically, Dr. Ferrante recommended 90 to 100 milligrams ("mg") of morphine daily using extended-release formulations and divided doses, in addition to an "adjunctive medication…including…gabapentin titrating to 600 mg tid, also providing a muscle relaxant such a Tizanidine or Robaxin." (*Id.* at 5.) Motion I requests an order directing Centurion to provide Plaintiff "proper [] 24-hour pain medication," and seemingly adopts Dr. Ferrante's recommendations. (Doc. 26 at 1, 8.) Plaintiff has amended his requested relief and now seeks the following injunctive relief: "[a] 24-hour formulation of morphine twice a day at 45 mgs twice a day [totaling 90 mg of morphine a day], an appropriate muscle relaxant consistent with Dr. Ferrante's recommendations, and a neuropathic pain medication [including Gabapentin] to treat the nerve pain[.]" (Doc. 96 at 11.) Centurion opposes the second motion for preliminary injunction and the updated requested relief. (*See* Docs. 32, 91, 93.)

The Court held a bifurcated hearing on the second motion for preliminary injunction

---

[1] *See Brooks v. Ryan*, CV-17-03964-PHX-DJH (hereinafter "*Brooks I*"). *Brooks I* involved similar claims against Arizona Department of Corrections' healthcare provider Corizon.

on February 16, 2022, and March 2, 2022 (collectively the "Hearing"), where it heard testimony and took evidence. (Doc. 63; Doc. 78.) Following the Hearing, the Court permitted the parties to file written closing arguments, objections, and amended proposed Findings of Fact and Conclusions of Law.[2]

Before the Court issued its decision on the second motion for preliminary injunction, Plaintiff filed Motion II. Motion II seeks to amend/correct the Joint Pre-trial Statement and Supplement the Record. (Doc. 107.) Centurion requested additional time to respond, (Motion III, Doc. 108), and filed their response in opposition to Motion II (Doc. 109). Plaintiff filed a reply to Motion II (Doc. 110).

## MOTION TO SUPPLEMENT (MOTION II)

In Motion II, Plaintiff seeks to supplement the record with Judge Silver's June 30, 2022 Order ("*Jensen* Order") in *Jensen v. Shinn*, case CV-12-00601-PHX-ROS. (*See* Doc. 107.) Specifically, Plaintiff offers the post-trial order in *Jensen v. Shinn*, a class action formerly titled *Parsons v. Ryan*, wherein the district court found *inter alia* Defendants Centurion and the Arizona Department of Corrections ("ADOC") engaged in systemic violations in providing minimally sufficient health care and minimally humane conditions in maximum custody units. *See* CV-12-00601-PHX-ROS, at Doc. 4335. Plaintiff contends that the order is relevant and lends support to his pending motion for preliminary injunction. (*See* Doc. 107.) Centurion objects arguing that Motion II should be summarily denied because: (1) Plaintiff fails to cite any legal basis to support or warrant supplementation; (2) the *Jensen* Order is a preliminary order which has no binding effect on individual claims because its findings have not been converted to a final judgment; and (3) Plaintiff does not offer any particular detail or context as to the *Jensen* Order's specific findings with respect to medications, chronic diseases or specialty care, or how such

---

[2] Plaintiff and Defendant filed proposed Findings of Fact and Conclusions of Law before the Hearing. (*See* Doc. 56; Doc. 57.) After the Hearing, Plaintiff filed his Closing Argument (Doc. 95) and his Amended Proposed Findings of Fact and Conclusions of Law (Doc. 96). Centurion filed its Amended Proposed Findings of Fact and Conclusions of Law (Doc. 91), Objection to Plaintiff's Proposed Order (Doc. 93), and Written Closing Argument (Doc. 94).

findings relate to the instant matter. (Doc. 109.)

Requests to supplement a pleading are governed by Rule 15(d), which provides that "[o]n motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Fed. R. Civ. P. 15(d). "The purpose of Rule 15(d) is to promote as complete an adjudication of the dispute between the parties as possible." *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*, 668 F.2d 1014, 1057 (9th Cir. 1981). Rule 15(d) is liberally construed absent a showing of prejudice to the opposing party. *Keith v. Volpe*, 858 F.2d 467, 475 (9th Cir. 1988). The Court has broad discretion to permit a supplemental pleading. *Id.* at 473.

Here, Plaintiff asks this Court to supplement the record with the *Jensen* Order's findings, namely that Centurion failed to provide: (1) necessary medication on a timely basis; (2) necessary care for chronic diseases; and (3) access to medically necessary specialty care on a timely basis. (*See* Doc. 107; Doc. 110 at 1–2.) Plaintiff argues that the only issue in Motion II is whether the Court is aware of *Jensen*'s findings such that this Court may take judicial notice. (Doc. 110 at 1.) In Motion II, Plaintiff cites no legal authority for his position. In reply, Plaintiff cites an Arizona Appeals Court case holding that courts may take judicial notice of the record in other actions within the same court. (Doc. 110 at 1–2 (citing *Visco v. Universal Refuse Removal Co.*, 462 P.2d 90, 11 Ariz. App. 73 (Ariz. App. 1969)). Plaintiff concludes, "[t]he referenced findings and conclusions cannot reasonably be questioned." (*Id.* at 1.)

The Court has reviewed the 200-page *Jensen* Order. Although *Jensen* arguably resembles Plaintiff's claims and involves a shared Defendant, the Court finds that relying on the *Jensen* Order, even as persuasive authority, does not serve to promote a more complete adjudication of the dispute between the parties in the instant case. Plaintiff fails to offer or reference any specific finding, including culpable conduct involving any particular individual or the sufficiency of any particular policy. Plaintiff makes no argument related to medication, chronic diseases, or specialty care such that the Court

could make a meaningful comparison to the *Jensen* Order. In *Jensen*, every prisoner in the ten complexes managed by the Arizona Department of Corrections, Rehabilitation, and Reentry ("ADCRR") is a class member. CV-12-00601-PHX-ROS (Doc. 4335 at 3.) Plaintiff fails to explain how *Jensen*'s legal conclusions or facts specifically relate to the instant case, notwithstanding his status as a class member. (*See* Doc. 107; Doc. 110.) Motion II is **DENIED**.

### SECOND MOTION FOR INJUNCTIVE RELIEF (MOTION I)

The Court has reviewed all relevant and admissible evidence related to the second motion for injunctive relief. The evidence was considered insofar as it is relevant to Plaintiff's allegations regarding Centurion's alleged failure to provide adequate pain management, the actual and current treatment provided for Plaintiff's chronic pain, Centurion's alleged failure to properly manage Plaintiff's pain, and Centurion's alleged retaliatory conduct related to Plaintiff's medical treatment and his ability to participate in litigation in a separate matter. In accordance with Rule 52(c) of the Federal Rules of Civil Procedure, the Court sets forth the following findings of fact and conclusions of law. For the following reasons, Plaintiff's second motion for injunctive relief is **DENIED**.

## I.     FINDINGS OF FACT[3]

### A. MEDICAL HISTORY

In 1998, Plaintiff received a diskography and laser discectomy for a herniated nucleus pulposus. (Doc. 26-1 at 3.) Plaintiff underwent an anterior radical discectomy in 2003. (*Id.*) Both surgeries were unsuccessful. (Doc. 96 at ¶¶ 3–4; Doc. 84 at 20.) In the years following, Plaintiff developed, and continues to suffer from, post-laminectomy syndrome, also referred to as "failed back syndrome" or "failed back surgery syndrome." (Doc. 26-1 at 3; Doc. 32-2 at 3; Doc. 91 at ¶ 2; Doc. 96 at ¶¶ 4–5.) As a result of his post-

---

[3] Plaintiff's vast and complicated medical history is only partially reflected herein. These findings are based upon the parties' filings. Although the Court considered some events before July 1, 2019—the date Centurion became the healthcare provider for ADOC— Plaintiff's allegations involving Corizon or the events underlying *Brooks I* were not considered. (*See* Doc. 26 at 2–5.)

laminectomy syndrome, he suffers chronic pain. (Doc. 96 at ¶ 7; Doc. 91 at ¶¶ 3, 7.)

Plaintiff has been incarcerated by ADOC since 2008.[4] (Doc. 91 at ¶ 1.) In 2009, and during his incarceration, Plaintiff suffered a compression fracture at his T12 vertebra and an incidental hemangioma in another thoracic vertebra. (Doc. 32-2 at 3; Doc. 96 at ¶ 10.) Prison healthcare providers have prescribed various pain-management protocols since 2010 to treat chronic pain, but alternative protocols have either failed or resulted in negative reactions. (Doc. 26 at 19; *see* Doc. 96 at ¶¶ 11–26.) In 2015, a lumbar magnetic resonance imagining ("MRI") study showed Plaintiff's "spinal canal and neural foramina were widely patent and that there was no obvious anatomic pathology or surgically correctable lesions to account for his pain." (Doc. 32-2 at 3; Doc. 91 at ¶¶ 8, 10.)  Plaintiff's chronic pain treatment in prison has included morphine sulfate ("morphine") since 2013. (*See* Doc. 96 at ¶ 23–24.)

**B.  TREATMENT FROM 2018 TO 2021**

On July 1, 2019, Centurion became the healthcare provider at ADOC. (Doc. 32-2 at 4.) Before Centurion assumed ADOC's healthcare, Corizon served as ADOC's healthcare provider.[5] (*See* Doc. 26 at 4.) Orthopedic specialist PA Bridget Barron ("PA Barron") evaluated Plaintiff at Maricopa Integrated Health System before and after Centurion became ADOC's healthcare provider. (Doc. 32-1 at 33; Doc. 96 at ¶¶ 34, 44; Doc. 84 at 39; Doc. 91 at ¶ 11.) On December 5, 2018, PA Barron saw Plaintiff for complaints of chronic or low back pain and worsening back pain. (Doc. 32-1 at 33; Doc. 96 at ¶ 34; Doc. 91 at ¶ 11.) Parties dispute PA Barron's treatment notes from December 5, 2018. (Doc. 83, Exh. 111; Doc. 15-2 at 10–22.)

On August 20, 2019, under Centurion's care, Plaintiff underwent imaging which revealed a hemangioma at vertebrae T-9. (Doc. 91 at ¶ 8; Doc. 96 at ¶ 41.) On the same date, PA Barron again saw Plaintiff. (Doc. 96 at ¶ 44; *see* Doc. 84 at 39.)

Following his visit with PA Barron, Plaintiff contends that he was confused as to

---

[4] Neither ADOC nor ADOC Director David Shinn are parties to this suit.

[5] Corizon is not a party to this suit.

PA Barron's 2018 notes and requested clarification from Nurse Practitioner Weigel ("NP Weigel").[6] (*See* Doc. 26, Exh. 1, ¶ 13; s*ee also* Doc. 84 at 39.) On August 26, 2019, Plaintiff saw NP Weigel. (Doc. 26 at ¶ 13.) According to Plaintiff, there was no follow-up to his request for clarification. (*See* Doc. 82, Exh. 1, ¶13.) Under NP Weigel's care, Plaintiff's morphine treatment remained 30mg instant release ("IR") in the morning and 30mg extended release ("ER") in the evening. (Doc. 82, Exh. 1, ¶ 13.)

## C. TREATMENT FROM 2021 TO PRESENT

Nurse Practitioner Laura Elliott ("NP Elliott") testified at the hearing, (Doc. 97 at 9–69.), and treated Plaintiff from February 2021 through June 2021.[7] (Doc. 91 at ¶ 14; *see* Doc. 97 at 14.) Nurse Practitioner Mary Redwine ("NP Redwine") also testified at the hearing, (Doc. 84 at 73–124), and treated Plaintiff between August 2021 through late February 2022. (Doc. 84 at 75; Doc. 91 at ¶ 25.)

On January 4, 2021, Centurion updated Plaintiff's morphine treatment from instant release morphine dosing to extended release morphine. (Doc. 26, Exh. 1, ¶ 28.)

Parties dispute the nature of certain events in March and April 2021. It is undisputed that on March 22, 2021, Plaintiff was directed to provide a blood sample for drug testing. (Doc. 91 at ¶ 21; Doc. 96 at ¶ 57.) It is also undisputed that Baclofen was discontinued for Plaintiff in April 2021. (Doc. 91 at ¶ 21; *see* Doc. 96 at ¶ 62.)

On February 4, 2021, Plaintiff requested access to a transcutaneous electrical nerve stimulation ("TENS") Unit. (Doc. 96 at ¶ 54.) Parties dispute whether Plaintiff had access to a TENS Unit between February and August 2017. Parties also dispute whether Centurion meaningfully responded to Plaintiff's repeated requests for TENS Unit access.

In connection to *Brooks I*, NP Elliott submitted a declaration, dated July 26, 2021, wherein she stated that Plaintiff had access to a TENS unit from February 2021 forward.

---

[6] In the Order setting the Hearing, the Court directed the parties to jointly prepare and file a pre-hearing statement and informed the parties of their responsibility to subpoena witnesses and required all potential witnesses to be listed on the party's list of witnesses. (Doc. 35.) Because NP Weigel was not disclosed within the period or manner specified by the Court, Plaintiff's untimely subpoena was quashed by the Court. (*See* Doc. 76.)

[7] NP Elliott testified that she treated Brooks from April 2021 through June 2021. (Doc. 97 at 14.) This difference is immaterial to the Court's analysis.

(Doc. 32-1, Exh. A, ¶ 14.)

Plaintiff filed at least seven Health Needs Requests ("HNR") between June and October 2021 requesting various relief. (*See* Doc. 82, Exh. 8 (HNR dated 6/9/21 requesting Baclofen and indicating pain throughout night); Exh. 7 (HNR dated 6/11/21 requesting clarification on Baclofen testing); Exh. 6 (HNR dated 6/30/21 requesting clarification on PA Barron's recommendation); Exh. 15 (HNR dated 8/15/21 requesting TENS unit); Exh. 16 (HNR dated 8/17/21 requesting morphine refill at 15 mg and 30 mg); Exh. 17 (HNR dated 9/24/21 requesting clarification on TENS Unit availability); Exh. 18 (HNR dated 10/19/21 requesting to meet with provider to discuss pain management plan)).

On August 18, 2021, Plaintiff filed an Inmate Informal Complaint alleging that NP Elliott had perjured herself in *Brooks I*, challenging Centurion's assertion that he had access to a TENS Unit at any time, and requesting NP Elliott be reported to the Board of Nursing. (Doc. 82, Exh. 4. "Inmate Informal Complaint.") On September 10, 2021, Jennifer Davie responded indicating, "A review of the situation mentioned in your informal complaint will occur. If an investigation is warranted, you will not be privy to the results of the investigation. … You have access to a TENS unit if the provider writes an order and one is ordered for you. You have a provider appointment scheduled to review your need medically for a TENS unit." (Doc. 82, Exh. 4, "Inmate Grievance / Informal Response.")

On September 10, 2021, Plaintiff filed an Inmate Grievance again requesting a formal investigation into NP Elliott's statements and requesting confirmation stating that Plaintiff did not have access to a TENS Unit during the time frame referenced by NP Elliott in her declaration. (Doc. 82, Exh. 4, "Inmate Grievance.") The written response, dated September 17, 2021, by Jenner Meyer indicates, "[y]ou had access to a TENS unit from 2/4/2021 until 8/17/2021 so NP Elliott was accurate in her reporting. It is clearly docuemented [sic] in your provider visit note on 2/4/2021 that you were the one who indicated to WP Waszkiewicz that TENS unit therapy had helped you in the past. It is unclear whether you chose to utilize your access to the TENS unit." (Doc. 82, Exh. 4, "Inmate Formal Grievance Response.")

Despite Plaintiff's requests to change his morning dosage to extended release, Centurion refused and maintained the 30 mg IR (a.m.) and 30 mg ER (p.m.) morphine regimen from March 9, 2019, through January 4, 2021. (Doc. 82, Exh. 1, ¶ 14.)

### D. CURRENT TREATMENT

Plaintiff's current pain management regimen includes 60 mg per day of morphine equivalents: 15 mg ER morphine in the morning; 15 mg ER morphine in the afternoon; and 30 mg ER morphine at bedtime. (Doc. 26-1 at 3; Doc. 32-1 at 2; Doc. 32-2 at 5; Doc. 96 at ¶ 82; Doc. 91 at ¶ 15.) This morphine regimen has been consistent since April 2021. (Doc. 91 at ¶ 15; Doc. 96 at ¶ 82.)

In October 2021, Plaintiff was reinstated on Baclofen. He currently receives 20 mg of Baclofen twice daily. (Doc. 91 at ¶ 17; Doc. 96 at ¶ 83.)

Plaintiff does not receive Gabapentin. Centurion maintains that Gabapentin is not medically indicated for Brooks' condition. (Doc. 91 at ¶ 23.)

Plaintiff currently has access to a TENS Unit and has been observed using it. (Doc. 91 at ¶ 19; Doc. 95 at 6–7.)

## II.   CONCLUSIONS OF LAW

### A. PRELIMINARY INJUNCTION STANDARD

A plaintiff seeking injunctive relief under Rule 65 of the Federal Rules of Civil Procedure must show: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of injunctive relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). Where a plaintiff seeks a mandatory injunction, rather than a prohibitory injunction, injunctive relief is "subject to a higher standard" and is "permissible when 'extreme or very serious damage will result' that is not 'capable of compensation in damages,' and the merits of the case are not 'doubtful.'" *Hernandez v. Sessions*, 872 F.3d 976, 999 (9th Cir. 2017) (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009)). Further, under the Prison Litigation Reform Act, injunctive relief, prohibitory or mandatory, must be narrowly drawn

1    and be the least intrusive means necessary to correct the harm. 18 U.S.C. § 3626(a)(2); *see*

2    *Gilmore v. People of the State of Cal.*, 220 F.3d 987, 999 (9th Cir. 2000).

### i.  LIKELIHOOD OF SUCCESS ON THE MERITS

4    To establish a likelihood of success on the merits in an Eighth Amendment medical

5    care claim, a prisoner must demonstrate "deliberate indifference to serious medical needs."

6    *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97,

7    104 (1976)). There are two prongs to the deliberate-indifference analysis: an objective

8    standard and a subjective standard. First, a prisoner must show a "serious medical need."

9    *Id.* (citations omitted). Serious medical need is evidenced by "the existence of an injury

10   that a reasonable doctor or patient would find important and worthy of comment or

11   treatment; the presence of a medical condition that significantly affects an individual's daily

12   activities; or the existence of chronic and substantial pain." *McGuckin v. Smith*, 974 F.2d

13   1050, 1059-60 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*,

14   104 F.3d 1133 (9th Cir. 1997).

15   Second, a prisoner must show that the defendant's response to that need was

16   deliberately indifferent. *Jett*, 439 F.3d at 1096; *Farmer v. Brennan*, 511 U.S. 825 (1994).

17   To show deliberate indifference, a prisoner "must show that the course of treatment the

18   doctors chose was medically unacceptable under the circumstances" and that this course of

19   treatment was chosen in conscious disregard of an excessive risk to the prisoner's health.

20   *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (citations omitted), *overruled in part*

21   *on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014) (en banc). "Prison

22   officials are deliberately indifferent to a prisoner's serious medical needs when they 'deny,

23   delay or intentionally interfere with medical treatment.'" *Wood v. Housewright*, 900 F.2d

24   1332, 1334 (9th Cir. 1990) (quoting *Hutchinson v. United States*, 838 F.2d 390, 394 (9th

25   Cir. 1988)).

26   Deliberate indifference may also be shown in several other ways. For example, a

27   failure to follow a specialist's recommendation may render a particular course of treatment

28   medically unacceptable. *See, e.g., Robbins v. Ryan*, No. CV-18-02343-PHX-DLR-DMF,

2019 WL 11870007, at *9 (D. Ariz. Apr. 2, 2019) (granting a preliminary injunction for specialist treatment and finding the subjective prong met where defendants failed to provide the treatment recommended by an orthopedist); *McNearney v. Wash. Dep't of Corrs.*, C11-5930 RBL/KLS, 2012 WL 3545267, at *26 (W.D. Wash. June 15, 2012) (granting a preliminary injunction for specialist treatment and finding the subjective prong met where the defendants failed to follow an orthopedic surgeon's strong recommendation for further orthopedic evaluation). Additionally, a failure to competently treat a serious medical condition, even if some treatment is prescribed, may constitute deliberate indifference. *See, e.g. Estelle*, 429 U.S. at 105 & n. 10 (treatment received by a prisoner can be so bad that the treatment itself manifests deliberate indifference); *Lopez v. Smith*, 203 F.3d 1122, 1132 (9th Cir. 2000) (prisoner does not have to prove he was completely denied medical care); *Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989) ("access to medical staff is meaningless unless that staff is competent and can render competent care").

Even if deliberate indifference is shown, to support an Eighth Amendment claim, the prisoner must demonstrate harm caused by the indifference. *Jett*, 439 F.3d at 1096. A plaintiff may meet the harm requirement by demonstrating that the defendant's actions or policies expose the prisoner to a "substantial risk for serious harm." *Parsons v. Ryan*, 754 F.3d 657, 677 (9th Cir. 2014). In deciding whether there has been deliberate indifference to an inmate's serious medical needs, Courts need not defer to the judgment of prison doctors or administrators. *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (internal quotation and citations omitted).

## III.   ANALYSIS

### A. LIKELIHOOD OF SUCCESS ON THE MERITS

Centurion concedes that Plaintiff suffers from a serious medical need. (*See* Doc. 91 at ¶ 7.) Plaintiff's post-laminectomy syndrome and resulting chronic pain constitutes a medical condition which significantly affects Plaintiff's daily activities. *See McGuckin*, 974 at 1059–60. The Court therefore moves directly to the subjective prong—whether the

1    response to Plaintiff's serious medical need amounts to deliberate indifference warranting

2    injunctive relief. *See Jett*, 439 F.3d at 1096.

3        ### i. No Specialist's Recommendation Exists to Support an Increased Morphine Dosage

4

5        Plaintiff asserts that his requests for adequate pain medication were repeatedly

6    ignored despite a specific pain regimen noted by orthopedic specialist PA Bridget Barron

7    ("PA Barron"). Plaintiff characterizes this regimen as both a "prescription" and a

8    "recommendation." (Doc. 96 at ¶ 35 ("PA Barron sent prescriptions back for Mr. Brooks

9    to receive 100 mgs continuous release morphine."); Doc. 26, Ex. 1, ¶ 10 ("Barron

10   recommended Baclofen 10mg 3x a day, MS 100mg ER BID 2x daily.")). Plaintiff did not

11   subpoena PA Barron as a witness at the hearing. Nor did Plaintiff provide any proof

12   showing the existence of a prescription. Plaintiff, instead, relies on his December 2018 and

13   August 2019 visits with PA Barron, certain documents produced from those visits, and his

14   interpretation thereof.

15       On December 5, 2018, PA Barron saw Plaintiff for complaints regarding chronic

16   lower back pain and worsening back pain. (Doc. 32-1 at 33; Doc. 96 at ¶ 34; Doc. 91 at ¶

17   11.) Records from PA Barron report "Current Outpatient Prescriptions" as "morphine 100

18   mg CR tablet" twice daily. (Doc. 91 at ¶ 12.) PA Barron further indicated, "[a]t this time,

19   I do not have further treatment outside of [physical therapy] to offer Mr. Brooks for his

20   low back pain." (Doc. 91 at ¶ 13.) On August 20, 2019, Plaintiff underwent imaging and

21   revealed a hemangioma at vertebrae T-9. (Doc. 91 at ¶ 8; Doc. 96 at ¶ 41.) On the same

22   date, PA Barron saw Plaintiff. (Doc. 96 at ¶ 44; s*ee* Doc. 84 at 39.) PA Barron's treatment

23   notes indicate, "[i]nstructions were given to facility to continue with current pain

24   management treatment plan." (Doc. 26, Exh. 1, ¶ 12.)   Following the August 2019

25   examination, PA Barron provided a letter following the August examination wherein she

26   indicated, "[a]t this time, I do not have further treatment outside of PT to offer [Plaintiff]

27   for his low back pain. In regard to the thoracic spine, I have ordered an MRI with and

28   without contrast to assess prior injury." (Doc. 83, Exh. 109.) PA Barron's letter makes no

reference to recommended medications or prescribed medications for Plaintiff.

Plaintiff relies on the Maricopa Integrated Health System's After Visit Summary ("After Visit Summary"), from his visit on December 5, 2018, which contains a section entitled, "Current Outpatient Prescriptions." (Doc. 83, Exh. 111; *See* Doc. 91 at ¶ 12.) He argues that this shows PA Barron affirmatively directed a specific medication regime which Centurion withheld from him and then ignored. (Doc. 82, Exh. 1, ¶ 10.) Nearly six months later, Plaintiff requested a follow-up appointment with PA Barron for an additional MRI, or in the alternative, "maybe we could just follow her recommendation to see if that would help with my pain level [.]" (*See* Doc. 82, Exh. 6 (HNR dated 6/30/21)). Plaintiff suggests that Centurion's written responses were dismissive. (Doc. 82, Exh. 1, ¶ 22 ("On August 7, 2020, I filed an Inmate Informal Complaint. I explained my chronic pain still had not been addressed in spite of numerous HNR's. I asked to follow ortho specialist's recommendation or the regime that worked for me in the past."; Exh. 4 (Inmate Informal Complaint Resolution dated 8/18/21)). Plaintiff testified that PA Barron confirmed her medication recommendations to him, as he understood them, during his August 2019 visit. (Doc. 84 at 39–41.)

Centurion's response was proportional considering PA Barron did not prescribe or recommend any specific medication, nor did treating individuals, such as NP Redwine, interpret the After Visit Summary as a medical recommendation. NP Redwine explained:

> I would like to mention that the note from PA Barron, both of them that I saw, where the two medications are listed, I don't understand that to be a recommendation or a prescription. Part of my job is to review consult notes every single day, and it is very, very common to find a medication list. … Sometimes errors happen and medications the patient's not on end up on that list. But in both of her notes where she had the opportunity to put a narrative note in, there were no recommendations given for an increase in morphine or anything regarding morphine at all. The only time that you see those specific medications listed is in the current med list, which again is not a recommendation for anything. It's just here's some information in our EMR that's printed out on the visit note

summary.

(Doc. 84 at 87.) Plaintiff has offered no medical opinion from any treating source to corroborate his interpretation. Plaintiff conceded that the 2018 After Visit Summary references neither "recommended medications" nor "prescribed medications" or how many times per day morphine was to be administered. (Doc. 84 at 64.) He denied engaging in pill-seeking behavior. (*See* Doc. 84 at 41 ("I'm not asking for anything more than what was recommended by their specialist that they sent me, that Centurion sent me to.")). On cross-examination, Plaintiff confirmed using illegal narcotics during a three-day prescription gap before his incarceration. (*Id.* at 60.) He indicated that he was previously dependent on pain medication to function. (*Id.* at 22–23.)

Centurion was not required to follow-up on Plaintiff's mistaken and unsupported interpretation. Because Centurion did not ignore a recommendation from a treating specialist, and no such recommendation existed, Plaintiff has failed to show a likelihood of success on the merits of his Eighth Amendment claim based on a failure to follow a specialist's recommendation.

### ii.  Centurion's Refusal to Increase Plaintiff's Morphine is Medically Acceptable

Plaintiff's current pain management includes 60 mg of morphine administered orally: 15 mg extended-release twice a day (morning and afternoon) and 30 mg extended-release morphine at bedtime. (Doc. 32-1 at 2; Doc. 26-1 at 3; Doc. 32-2 at 5; Doc. 96 at ¶ 82; Doc. 91 at ¶ 15.) This morphine regimen has remained consistent since April 2021. (Doc. 91 at ¶ 15.) Plaintiff seeks an increase in morphine to 90 mg daily using extended-release formulations and divided doses. (*See* Doc. 96 at 11.) In response, Centurion argues that Plaintiff's 60 mg per day of morphine equivalents is more than satisfactory to provide 24-hour pain relief; an increase of morphine would be unsafe; and long-term opiate therapy for pain management is neither mandated by the standard of care nor is chronic opiate therapy employed outside of hospice and cancer treatment settings. (Doc. 32 at 12–13; Doc. 91 at ¶¶ 30–35.)

As an initial matter, a difference of medical opinion generally does not establish deliberate indifference until the plaintiff can show that the course of treatment chosen was medically unacceptable under the circumstances. *See Jackson*, 90 F.3d at 332. Simply showing that a course of treatment proves to be ineffective, without showing that the medical professional's conduct was medically unacceptable under the circumstances and chosen in conscious disregard to Plaintiff's health, does not establish a claim for deliberate indifference. *Nicholson v. Finander*, No. CV 12-9993-FMO-JEM, 2014 U.S. Dist. LEXIS 51417, 2014 WL 1407828, at *9 (C.D. Cal. 2014) (internal citation omitted). Moreover, a prisoner generally has no right to dictate what medications he is prescribed. *Stiltner v. Rhay*, 371 F.2d 420, 421 n.3 (9th Cir. 1967). This is particularly true with morphine, and multiple district courts in this circuit have found that a prisoner's denial of morphine does not amount to deliberate indifference.[8]

Morphine has been part of Plaintiff's long-term opiate therapy since 2013, and current and former healthcare providers have testified to Plaintiff's relative stability on long-term opiate therapy. Centurion does not indicate a desire to discontinue Plaintiff's morphine outright. The issue before this Court is not whether Plaintiff's morphine should be tapered or discontinued but whether Centurion's refusal to increase Plaintiff's current morphine dosage is "medically unacceptable under the circumstances" and done in "conscious disregard of an excessive risk" to Plaintiff's health. *Jackson*, 90 F.3d at 332.

---

[8] *See, e.g., Arellano v. Sedighi*, No. 15-cv-02059-AJB-BGS, 2020 WL 5877832 at *46 (S.D. Cal. Oct. 1, 2020) ("Plaintiff's request for ... Morphine is a difference of opinion and preference by Plaintiff. But failure to provide Plaintiff with the specific medication he requested and differences in judgment regarding an appropriate medical treatment is not enough to establish deliberate indifference."); *Gonzales v. Ugweze*, No. 1:11-CV-01588-LJO, 2014 WL 223506 at *9 (E.D. Cal. Jan. 21, 2014), *subsequently aff'd*, 594 F. App'x 448 (9th Cir. 2015) (finding plaintiff's opinion that he should have been provided other types of pain medication does not create a dispute of material fact to preclude summary judgment); *Gonzales v. Ugweze*, No. 1:11-CV-01588-LJO, 2014 WL 223506, at *9 (E.D. Cal. Jan. 21, 2014), *subsequently aff'd*, 594 F. App'x 448 (9th Cir. 2015) (finding plaintiff's opinion that he should have been provided other types of pain medication does not create a dispute of material fact to preclude summary judgment); *Parlin v. Sodhi*, No. 10-6120 VBF (MRW), 2012 WL 5411710, at *5 (C.D. Cal. Aug. 2012) ("[P]laintiff's claim is that he did not receive the type of treatment and pain medication that he wanted when he wanted it. His preference for stronger medication [...] represents precisely the type of difference in medical opinion between lay prisoner and medical personnel that is insufficient to establish a constitutional violation.").

1   Plaintiff has not met his burden.

2          First, Plaintiff offers expert testimony from Dr. Ferrante. (Doc. 92-1.) Dr. Ferrante
3   highlighted the importance of 24-hour analgesia, which he defined as pain relief. (*Id.* at
4   13.) Dr. Ferrante's opinion is based upon the severity and chronicity of Plaintiff's self-
5   reported pain. (Doc. 26-1 at 4.) The Court has doubts regarding Dr. Ferrante's expert
6   opinion. For example, Dr. Ferrante could not specify the most recent medical record he
7   reviewed; he could not identify the date range for the records he reviewed; and he was
8   uncertain whether he reviewed any medical records from 2022. (Doc. 92-1 at 44, 63.) When
9   questioned about analgesic levels, Dr. Ferrante was unaware of Plaintiff's *current* morphine
10  dosage, specifically that Plaintiff received 30 mg extended-release morphine in the
11  evening. (Doc. 92-1 at 57–59.) When asked to clarify whether Plaintiff's current morphine
12  dosage provided 24-hour pain analgesia levels, Dr. Ferrante conceded that it did. (*Id.* ("But
13  he does achieve 24-hour levels if he is taking the 30-miiligram extended release before he
14  goes to bed."); Doc. 91 at ¶ 37.) Dr. Ferrante's opinion also concluded that Centurion failed
15  to communicate the recommendations from outside medical consultants to Plaintiff,
16  relying in part on the same misinterpretation from PA Barron's 2018 treatment notes. (Doc.
17  92-1 at 20 ("But, apparently, there was no knowledge of [sic] Mr. Brooks about the
18  recommendations of Ms. Barron for about three-quarters of a year."); Doc. 92-1 at 65–66
19  ("I believe that Ms. Barron suggested something along those lines [referencing 100
20  milligrams of morphine]. As I said, my memory on this is a little scarce.")) Dr. Ferrante
21  further indicated, he was "aware of no blood levels suggesting subtherapeutic morphine
22  levels, or the absence thereof of any morphine levels." (Doc. 92-1 at 68.)

23         Second, Plaintiff fails to prove that NP Redwine's refusal to increase his morphine
24  was done in conscious disregard of an excessive risk. When asked whether Plaintiff is
25  currently receiving morphine within the standard of care, NP Redwine explained:

26              It is close to the very, very fringe edge. He's been stable on this
27              dose for several years now, and when he became my patient,
                he was already on it. I didn't see any benefit to reducing his
28              dose or taking him off of that medication because he had been
                stable on it for so long, but I also see that there is no benefit to

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> be gained by increasing it because his source of pain is not going to change, and I don't want him to grow more pain receptors, you know, that are just going to lower his tolerance further while we [have] him close to a dangerous dose. Anything above 50 milligrams per day increases that risk fourfold, so he's already above that.

(Doc. 84 at 80–81.) NP Redwine further explained that if Plaintiff was a new patient with the same condition and presentation, he would likely not be prescribed morphine, and certainly would not be prescribed morphine long-term. (Doc. 84 at 81; Doc. 91 at ¶ 29.) Dr. Fowlkes, NP Redwine, and NP Elliott similarly testified that long-term morphine treatment is atypical for chronic pain. (Doc. 97 at 73–74; Doc. 84 at 80–81; Doc. 97 at 18.) Although NP Redwine opined that she was comfortable with continuing his current dosage of morphine, she explained that treating Plaintiff's condition was further complicated because of Plaintiff's "psychological addiction as well as physiological dependance." (Doc. 84 at 122; Doc. 91 at ¶ 43.)

NP Elliott similarly testified to Plaintiff's reluctance to abandon morphine treatment:

> I discussed with Mr. Brooks coming off of morphine at one point because we discussed the fact that there is a - there is a well-known phenomenon that, when people are weaned off morphine in a controlled setting, that their pain receptor sites tend to regrow so that they can handle the pain with other modalities that are nonopiate. He indicated to me that he did not want to be on morphine, that he was a pilot and that, when he gets out, he'd like to fly again and that he's restricted from doing that when he's on morphine, and I indicated to him that's even more reason why to think about doing a controlled wean off of your morphine.

(Doc. 97 at 18–19.)

Plaintiff's long-term exposure to morphine does not make a dosage increase safe. Dr. Fowlkes indicated that CDC Guidelines caution against prescribing more than 50 milligrams of morphine daily due to the risk of overdose. (Doc. 97 at 73–74.) NP Redwine testified that based on her independent medical judgment, she believed increasing Plaintiff's morphine would be ineffective and unsafe and could lead to increased risk of

overdose and death. (Doc. 84 at 90–91, 122.) As NP Redwine explained, the decision to keep Plaintiff on long-term morphine is a result of his two-decade exposure to morphine and his reported stability. (Doc. 84 at 94–95 ("But like I said before, that doesn't equate to any dose being safe or any increased dose being safe, just the dose he's on now is safe because he's been on it so long.")). Plaintiff's preference for increased morphine, in light of his individual circumstances, represents the type of difference in medical opinion between a prisoner and medical personnel that is insufficient to establish a constitutional violation. As such, he has failed to show that Centurion was deliberately indifferent to his medical needs by refusing to increase his current morphine prescription.

### iii.  NP Elliott's Decision to Discontinue Baclofen Was Medically Acceptable Under the Circumstances

Plaintiff asserts that NP Elliott "abruptly discontinued" his Baclofen in March 2021 and allowed him to go into withdrawals without proper weaning. (*See* Doc. 26 at 6.) He suggests that his Baclofen discontinuation correlated to his court appearances in *Brooks I* and interfered with his ability to participate in court proceedings. (Doc. 26 at 6.) Centurion argues that, at the time, discontinuation was appropriate because Baclofen was no longer medically indicated for Plaintiff's condition and blood tests suggested noncompliance. (Doc. 32 at 11.) Nonetheless, Centurion argues, Plaintiff was reinstated and he has remained on Baclofen since October 2021, therefore he is *currently* receiving appropriate care and pain management. (*Id.* at 5.)

On March 22, 2021, Plaintiff was directed to provide a blood sample for drug testing.[9] (Doc. 96 at ¶ 57.) According to NP Elliott, Baclofen was discontinued after labs

---

[9] Plaintiff repeatedly attacked the integrity of the lab results arguing that their reliability is discounted because such tests are not cleared or approved by the U.S. Food and Drug Administration. (*See* Doc. 95 at 10; Doc. 97 at 34–37.) Plaintiff offered no expert testimony to support his assertion. Even if the test's reliability was properly implicated, the question is whether NP Elliott's decision to wean Plaintiff off Baclofen amounts to deliberate indifference. NP Elliott discussed her decision with the site medical director and with Plaintiff, who expressed his withdrawal concerns. (Doc. 97 at 27.) Assuming *in arguendo* that NP Elliott's reliance on the test was misplaced, there is nothing about her subsequent actions that concern the Court.

- 18 -

indicated a lack of Baclofen in Plaintiff's system.[10] (Doc. 91 at ¶ 21.) NP Elliott further explained that the labs demonstrated prolonged noncompliance. (Doc. 97 at 30 ("You know, the half-life of baclofen might not be picked up in somebody who had been on it for four or five days, it might not be in, but somebody who had been on it for a few years, it would definitely still be in his system if he had been taking it."); Doc. 32-1, at 2, ¶ 8 ("he also had a lab test showing no Baclofen detected whatsoever, indicating he was not taking it.")) Plaintiff filed an HRN challenging the blood test. (*See* Doc. 82, Exh. 7 (HNR dated 6/11/21, "I would like to know how much Baclofen should be in my system … I'll be waiting for your expert opinion."))

Despite's Plaintiff's claims to the contrary, NP Elliott testified that there is no black box warning for weaning off Baclofen when it is orally administrated.[11] (Doc. 97 at 29.) Baclofen's black box warning relates to discontinuing medication when it is administered through an intrathecal pump into the spine. (*Id.* at 27.) Plaintiff offered no evidence to the contrary. Moreover, NP Elliott explained that Plaintiff was slowly weaned off the medication, beginning at 10 mg twice a day, staggered down to once a day for five days, and then to 5 mg once a day for five days, and then discontinued. (*Id.* at 25.) NP Elliott indicated that, due to pharmacy response time, Plaintiff may have been without Baclofen for a few days but was unsure of whether he was without Baclofen during his settlement conference in *Brooks I*. (Doc. 97 at 34–35.) The Court found NP Elliott's explanation why she weaned Plaintiff off of Baclofen to be credible and medically reasonable.

Plaintiff's Baclofen was eventually reinstated by NP Redwine based on his presentation of paraspinal tension. (Doc. 96 at ¶ 79; Doc. Doc. 91 at ¶ 17.) NP Redwine

---

[10] NP Elliott also testified that Baclofen may not have been medically indicated for Plaintiff. (Doc. 97 at 56 ("I had talked to him on [March 29th] about the fact that there was really concerns for me, based on no spasticity in his back, that he be on both morphine and baclofen because of that high level of risk using the two together and that I was going to take him off of it.")). On March 30, 2021, NP Elliott received the lab results showing no Baclofen detected in Plaintiff's system. (*Id.*)

[11] A black box warning is required by the U.S. Food and Drug Administration for certain medications that carry serious safety risks. (*See* https://health.clevelandclinic.org/what-does-it-mean-if-my-medication-has-a-black-box-warning/ (last accessed on August 25, 2022.)

1  explained:

2
> I prescribed Mr. Brooks [B]aclofen because he endorsed to me
> that he had previously used that medication with good success
> and reduction of his overall pain. *Also, on my physical exam of*
> *him, he did have some paraspinal tension in the lower lumbar*
> *and the midthoracic, and I believed that it was a benefit that*
> *would be worth the risk.* Baclofen is not a highly sedating
> muscle relaxer, and since he had been on it before without any
> issues, I didn't see that there would be any medical
> contraindication to putting him back on it as an adjunctive
> therapy with his morphine.

(Doc. 84 at 81) (emphasis added). Currently, Plaintiff receives 20 mg of Baclofen twice

daily. (Doc. 91 at ¶ 17.) The fact that Plaintiff was reinstated on Baclofen, by a different

nurse practitioner, does not diminish NP Elliott's reasons for discontinuing the medication

in March 2021. NP Elliott did not allow Plaintiff to go through Baclofen withdrawal

without properly weaning him or without making sure he was properly monitored through

withdrawal. The Court rejects Plaintiff's claim that the Baclofen discontinuance was related

to or done with the intent to disrupt Plaintiff's Court proceedings. (*See* Doc. 95 at 10

(Plaintiff argues that "[NP] Elliott testified that she prescribed the baclofen until March 31,

2021, re-ordered a weaning dose, and did not reinstate the baclofen until after April 8, 2021

– 3 days after the settlement conference [in *Brooks I*]."}) The Court finds that under the

circumstances, NP Elliott's decision to discontinue Baclofen was medically acceptable as

the medication was not medically indicated for Plaintiff and because NP Elliott reasonably

suspected drug diversion.

### iv. Plaintiff Currently Has Access to a TENS Unit

Plaintiff argues that between 2017 and December 2021, he did not have access to a

TENS Unit. (Doc. 26 at 8.) Plaintiff suggests that Centurion staff misinformed and

misrepresented his access to a TENS Unit. (Doc. 26 at 8.) To the extent Plaintiff argues

that such misinformation amounts to a purposeful act or failure to respond to his pain and

medical need, the Court disagrees.

In connection to *Brooks I*, NP Elliott submitted a declaration, dated July 26, 2021, wherein she stated that Plaintiff had access to a TENS unit from February 2021 forward. (Doc. 32-1, Exh. A, ¶ 14.) After discovering this information, Plaintiff submitted an HNR on August 15, 2021 requesting the TENS unit. (Doc. 82, Exh. 15 ("NP Elliot [sic] stated in her declaration to the court, that I've had access to this for the entire time (which I have not) Elliot [sic] stated in a legal document that I have access/option to request use of TENS Unit. I would like that treatment asap.")) On August 16, 2021, Centurion staff responded, "[TENS] unit has been ordered, will call you up when it arrives." (*Id.*) On September 24, 2021, Plaintiff submitted another HNR requesting a status update on the TENS Unit. (Doc. 82, Exh. 17.) Plaintiff received a response to his Medical Grievance dated August 18, 2021. (Doc. 26, Exh. 1, ¶ 45.) Therein, Jennifer Meyer, Director of Nursing, informed Plaintiff, "You had access to a TENS unit from 2/4/2021 until 8/17/2021 so NP Elliott was accurate in her reporting." (Doc. 26, Exh. 1, ¶ 45.) On September 25, 2021, Centurion staff responded that the TENS unit was not approved at the Tucson Complex per the Medical Director. (Doc. 82, Exh. 17; Doc. 96 at ¶ 78.) On cross examination, NP Elliott described her statement—indicating Plaintiff had access to a TENS Unit—in the declaration as a "misunderstanding." (Doc. 97 at 52.)

Deliberate indifference is a substantially higher standard than negligence and has been associated with affirmatively culpable conduct. *Estelle*, 429 U.S. at 104. "Inadvertent failure" to provide medical care, "a complaint that a physician has been negligent in diagnosing or treating a medical condition," and medical malpractice claims do not qualify as deliberate indifference claims. *Id.* at 105 (quotations omitted). Prison officials must have "a sufficiently culpable state of mind." *Farmer*, 511 U.S. at 825.

Centurion's repeated denials and subsequent explanations concern the Court. Centurion's conduct, however, amounts to an inadvertent failure to provide medical care. The record indicates that Plaintiff was unaware of the available treatment modality, and when he repeatedly requested such treatment, he was denied without meaningful explanation. For uncertain reasons, the Centurion site medical director ultimately restricted

1
2
3
4
5
6
7
8
9
10
11
12

Plaintiff's access to a TENS Unit. (Doc. 82, Exh. 17 (indicating TENS unit was not approved at the Tucson Complex per the Medical Director); Doc. 97 at 50–51 (NP Elliott indicating that the Centurion site medical director did "not refuse[]" but wanted clinical indications and research before allowing Plaintiff access to the TENS Unit)). Centurion did not provide any cogent explanation why access was restricted to Plaintiff after August 17, 2021, or if Plaintiff had meaningful access to the unit before then. NP Elliott's declaration, which the Court finds credible when considered together with her testimony, does not rise to a sufficiently culpable state of mind but reflected an inaccurate understanding based on the information available to her at the time. Plaintiff, nonetheless, has current access to a TENS Unit for pain relief and has been observed using it. (Doc. 91 at ¶ 19; Doc. 95 at 6–7 ("Yes, Mr. Brooks *currently* has access to a TENS Unit.") (emphasis added)). Based on Centurion's *current* conduct, injunctive relief is unwarranted. *Farmer*, 511 U.S. at 845.

13

### v.  Gabapentin is Not Medically Indicated or Necessary for Plaintiff

14
15
16
17
18
19
20
21
22
23
24
25

Centurion's expert witness Dr. Thomas Fowlkes, NP Elliott, and NP Redwine provided consistent testimony regarding Gabapentin and its limited application. (Doc. 84 at 113; Doc. 97 at 31; Doc. 97 at 81.) Dr. Fowlkes explained that Gabapentin is an anticonvulsant that is sometimes used for the treatment of chronic pain, although it does not have that FDA indication. (Doc. 97 at 81.) It is often prescribed when there are strong clinical indications including neuralgia and seizures. (*Id.*) NP Elliott and NP Redwine testified that Gabapentin can also be used to treat neuropathy, trigeminal neuralgia, and uncontrolled seizures. (Doc. 84 at 113; Doc. 97 at 31.) According to NP Elliott, Plaintiff has no evidence of neuropathy, trigeminal neuralgia, or uncontrolled seizures. (Doc. 97 at 31.) NP Elliott testified that Gabapentin was not medically indicated or necessary for Plaintiff. (*Id.*) Similarly, NP Redwine testified that Plaintiff had no diagnosed neuropathy and that Gabapentin was not medically indicated for Plaintiff. (Doc. 84 at 84.)

26
27
28

Plaintiff offers no medical opinion from a current treating medical source to support that Gabapentin is medically indicated or necessary. That Plaintiff was prescribed Gabapentin previously does not support his instant request. (*See* Doc. 26, Exh. 1, ¶ 36

("pain specialists Jane Bramwell, MD and Brian Page, DO both prescribed Gabapentin 300mg BID which treated neuropathic pain effectively from 2013–2018.")). A difference of opinion between an inmate and medical authorities regarding proper medical treatment does not rise to deliberate indifference. *See Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (finding that a prisoner who alleges "nothing more than a difference of medical opinion" regarding medical treatment fails to establish deliberate indifference as a matter of law); *see also Franklin v. Oregon, State Welfare Div.*, 662 F.2d 1337, 1344 (9th Cir. 1981) (same). Plaintiff's claims regarding Gabapentin fail.

### vi.  Plaintiff Fails to Show Deliberate Indifference

Plaintiff has failed to prove that his medical care under Centurion amounts to deliberate indifference. Based on the evidence presented, a jury could not reasonably find that any particular individual was indifferent to Plaintiff's needs. As such, the Court declines to provide the relief sought in Plaintiff's motion.

### B.  Remaining *Winters* Factors

The Court finds it is unnecessary to consider the remaining factors of irreparable injury, balancing of the equities, and the public interest. Plaintiff's claims fail on the merits, and he is not entitled to any injunctive relief regardless of how the other factors are weighed.

## TRIAL ON THE MERITS

In his written closing argument, Plaintiff asks this Court to consolidate the motion for a preliminary injunction with a trial on the merits pursuant to Rule 65 of the Federal Rules of Civil Procedure. (Doc. 95 at 14 ("This Court has heard the evidence. I do not know what additional evidence can be produced beyond the fact witnesses and expert testimony. This court should consider consolidating this hearing with a trial on the merits."))

Fed. R. Civ. P. 65(a)(2) provides that "[b]efore or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing." When consolidating a motion for a preliminary injunction with a trial on the merits, "the court must preserve any party's right to a jury trial." Fed. R.

Civ. P. 65(a)(2). Under Rule 65(a)(2), a matter may be consolidated where the parties are permitted to present all material evidence. *See Abraham Zion Corp. v. Lebow*, 761 F.2d 93, 101 (2d Cir. 1985).  Where such consolidation is considered, "the court should provide the parties with clear and unambiguous notice of the intended consolidation either before the hearing commences or at a time which will afford the parties a full opportunity to present their respective cases." *Air Line Pilots Ass'n, Int'l v. Alaska Airlines, Inc.*, 898 F.2d 1393, 1397 (9th Cir. 1990) (cleaned up).

Plaintiff submits that the full record is before the Court. Because his Complaint only seeks injunctive and declaratory relief based on legal arguments that this Court has rejected, a separate trial on the merits seems unnecessary. The Court, however, has not given the parties any notice of such consolidation, and Centurion has not had the opportunity to object to Plaintiff's request. The Court will provide the parties an opportunity to file an objection to the proposed consolidation on the merits, if they so choose. If there are no objections from either party after seven (7) days from the date of this order, the Court will exercise its discretion, consolidate the motion with a trial on the merits, and enter judgment for Centurion accordingly.

///

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **ORDER**

Accordingly,

    **IT IS ORDERED:**

    (1)    **DENYING WITHOUT PREJUDICE** Plaintiff's second Motion for Preliminary Injunction (Doc. 26);

    (2)    **DENYING WITHOUT PREJUDICE** Plaintiff's Motion to Supplement the Record and/or Amend the Joint Pre-Trial Report (Doc. 107);

    (3)    **GRANTING** Defendant Centurion of Arizona LLC's unopposed Motion for Extension of Time to Respond (Doc. 108); and

    (4)    **PROVIDING** the parties seven (7) days from the date of this order to file an objection, if they so choose, to the Court's intent to consolidate the second motion for a preliminary injunction with a trial on the merits pursuant to Fed. R. Civ. P. 65. If there are no objections filed during the allotted period, the Court will enter judgment for Centurion accordingly.

Dated this 28th day of September, 2022.

_____
Honorable John C. Hinderaker
United States District Judge